JAROSZ v DETROIT AUTOMOBILE INTER-INSURANCE
EXCHANGE

Docket No. 68003. Argued May 3, 1983 (Calendar No. 6).—Decided
March 12, 1984.

Joseph W. Jarosz brought an action in the Wayne Circuit Court
against the Detroit Automobile Inter-Insurance Exchange, seek-
ing a declaration that a certain part of social security old-age
benefits may not be deducted from no-fault wage-loss benefits
payable as the result of an automobile accident. Had he not
been injured in the accident, Mr. Jarosz would have worked for
a new employer after his mandatory retirement from his first
employment upon becoming 65 years old, and his social secu-
rity benefits would have been reduced by an amount dependent
on his wage in his new job. Because he was unemployed after
retirement, he received the full amount of retirement benefits,
and the insurer asserted that the amount of the reduction
which he would have suffered had he been working should be
deducted from work-loss benefits payable to him. The court,
Thomas J. Brennan, J., granted the defendant's motion for
summary judgment. The Court of Appeals, N. J. Kaufman, P.J.,
and Allen and D. C. Riley, JJ., affirmed, holding that social
security benefits could be deducted to the extent that they
duplicated no-fault work-loss benefits (Docket No. 50615). The
plaintiff appeals.

In an opinion by Justice Ryan, joined by Chief Justice Wil-
liams and Justices Cavanagh and Boyle, the Supreme Court
*held:*

Social security old-age benefits which do not serve the same
purpose as no-fault work-loss benefits and which are not pro-
vided or required to be provided as a result of injuries received
in the same motor vehicle accident giving rise to payment of

REFERENCES FOR POINTS IN HEADNOTES

[1] 70 Am Jur 2d, Social Security and Medicare § 4.

[1-5] 7 Am Jur 2d, Automobile Insurance §§ 361, 368.

Validity and construction of no-fault insurance plans providing for
reduction of benefits otherwise payable by amounts receivable
from independent collateral sources. 10 ALR4th 996.

work-loss benefits may not be deducted from no-fault work-loss benefits.

1. An insurer may subtract from personal protection insurance benefits otherwise payable for injuries received in a motor vehicle accident benefits provided or required to be provided under the laws of any state or the federal government. However, not all benefits provided by the state or federal government must be subtracted. Benefits which bear no relation to no-fault benefits or to the reason for which no-fault benefits are paid are not subject to setoff. Whether specific benefits must be deducted depends upon whether the benefits serve the same purpose as the no-fault benefits, and are provided or are required to be provided as a result of the same accident giving rise to payment of the no-fault benefits.

2. To determine whether the questioned governmental benefits serve the same purpose as no-fault benefits it is necessary to identify the ultimate beneficiary, the nature of the benefits, the reason for payment, and the events which trigger entitlement. In this case, the social security benefits and the no-fault benefits are intended to be a substitute for wages earned, but age is the criterion which triggers payment of the social security benefits and identifies the beneficiary, while the occurrence of a motor vehicle accident triggers payment of the no-fault work-loss benefits to the person injured. The occurrence of the accident is totally irrelevant to the social security plan, and payment of social security benefits is not specifically conditioned on sustaining injuries in an accident.

3. No-fault work-loss benefits are paid for loss of income because of an inability to work. Social security old-age benefits, while arguably income, are not income from work. That the plaintiff receives income in the form of social security benefits does not vitiate the fact that he has lost income from work he would have performed but for the accident.

Reversed and remanded.

Justice Levin, joined by Justices Kavanagh and Brickley, dissenting, wrote:

Social security retirement benefits which would not have been paid to a person injured in an automobile accident but for the resultant loss of income from a post-retirement job duplicate no-fault work-loss benefits and should be subtracted from no-fault work-loss benefits.

1. Social security retirement benefits that would not be paid if a person over 65 had not been injured in an automobile accident and had been working at a post-retirement job serve

the same income maintenance and replacement purpose as that served by workers' compensation benefits and social security survivors' and disability benefits and, like them, should be subtracted from no-fault work-loss benefits. The social security retirement payments at issue in this case are not provided solely because the plaintiff reached 65 years of age, but rather because he lost income from wages as a result of an accident. To the extent that post-65 social security retirement payments replace lost income from wages, they serve the same purpose as pre-65 social security disability payments, which the Supreme Court has held must be subtracted from no-fault work-loss benefits.

2. The social security retirement payments at issue in this case were provided to the plaintiff as a result of the same accident for which no-fault benefits are payable. To conclude that the social security retirement payments in issue were not provided as a result of the automobile accident is to ignore that these social security payments would not be paid but for the plaintiff's loss of income from wages, which in turn resulted from the automobile accident. The automobile accident that entitled the plaintiff to no-fault work-loss benefits is exactly the same event but for which the social security retirement benefits in issue would not have been paid. The setoff required by the no-fault act is not limited to cases in which an accident initiates the governmentally mandated payments sought to be subtracted. To the extent that, but for the accident, the governmentally mandated benefits would no longer be paid, the payments replace income lost as a result of the accident and should be subtracted. Failure to set off the social security retirement payments at issue in this case renders the plaintiff financially better off after the accident than he would have been had he not been injured, a result inconsistent with the legislative purpose of requiring coordination of benefits.

109 Mich App 86; 310 NW2d 903 (1981) reversed.

### OPINION OF THE COURT

1. INSURANCE — NO-FAULT — SOCIAL SECURITY — REDUCTION OF BENEFITS.

Social security old-age benefits which do not serve the same purpose as no-fault work-loss benefits and are not provided or required to be provided as a result of injuries received in the same motor vehicle accident giving rise to payment of work-loss benefits may not be deducted from no-fault work-loss benefits (42 USC 402; MCL 500.3109[1]; MSA 24.13109[1]).

2. INSURANCE — NO-FAULT — REDUCTION OF BENEFITS.

Benefits provided or required to be provided under the laws of
any state or the federal government must be deducted from
personal protection insurance benefits otherwise payable for an
injury incurred in a motor vehicle accident where they serve
the same purpose as the personal protection benefits and are
provided or are required to be provided as a result of the same
accident (MCL 500.3109[1]; MSA 24.13109[1]).

3. INSURANCE — NO-FAULT — REDUCTION OF BENEFITS.

Benefits provided or required to be provided by the laws of any
state or the federal government may not be subtracted from
personal protection insurance benefits otherwise payable where
they bear no relation to personal protection benefits or to the
reason for which such benefits are paid (MCL 500.3109[1]; MSA
24.13109[1]).

DISSENTING OPINION BY LEVIN, J.

4. INSURANCE — NO-FAULT — SOCIAL SECURITY — REDUCTION OF
BENEFITS.

*Social security retirement benefits which would not have been
paid to a person injured in an automobile accident except for a
resultant loss of income from a post-retirement job and which
duplicate no-fault work-loss benefits must be coordinated with
and subtracted from no-fault work-loss benefits (42 USC 402;
MCL 500.3109[1]; MSA 24.13109[1]).*

5. INSURANCE — NO-FAULT — SOCIAL SECURITY — REDUCTION OF
BENEFITS.

*No-fault work-loss benefits reimburse an injured person and his
dependents for the economic hardship caused by the loss of
income from work that he would have performed had he not
been injured; governmentally mandated payments which, like
no-fault work-loss benefits, replace such income are benefits
within the meaning of the no-fault act and must be set off from
no-fault benefits otherwise payable (42 USC 402; MCL
500.3109[1]; MSA 24.13109[1]).*

*Kelman, Loria, Downing, Schneider & Simpson*
(by *Michael L. Pitt)* for the plaintiff.

*Dickinson, Mourad, Brandt, Hanlon & Becker*
(by *A. J. Galsterer, Jr.)* and *Gromek, Bendure &*

*Thomas* (by *Carl L. Gromek* and *Nancy L. Bosh)*
for the defendant.

RYAN, J. This case presents still another varia-
tion of the application of § 3109(1) of the no-fault
insurance act.[1]

Section 3109(1) provides:

"Benefits provided or required to be provided under
the laws of any state or the federal government shall be
subtracted from the personal protection insurance bene-
fits otherwise payable for the injury."

The primary issue is whether a portion of the
social security old-age benefits being received by
the appellant is the type of governmental benefit
which, under § 3109(1), must be deducted from no-
fault wage-loss benefits otherwise due.

We hold, on the facts of the case, that it is not
and reverse the judgment of the Court of Appeals.

I

On June 27, 1977, plaintiff Joseph W. Jarosz,
then 64 years of age, was injured while riding in a
motor vehicle that was struck broadside. His inju-
ries disabled him from working as a manager for
Borman Foods where he had been paid $285 per
week. As a result, DAIIE, his no-fault insurer,
began paying him work-loss benefits under § 3107
of the no-fault act, correctly computed at 85% of
his $285 weekly salary. On November 1, 1977,
after turning 65 years of age, Mr. Jarosz began
mandatory retirement pursuant to company pol-
icy. At about the same time, he applied for and
began receiving social security retirement benefits

---

[1] MCL 500.3101 *et seq.;* MSA 24.13101 *et seq.*

of $455.20 per month, the amount to which he was entitled as an unemployed retiree.

On March 25, 1978, after learning of Mr. Jarosz's retirement, DAIIE terminated the payment of work-loss benefits. Shortly thereafter, Mr. Jarosz furnished the insurance company with proof that, but for the accident, he would have gone to work for Supreme Steel Company on November 1, 1977, earning $200 per week. DAIIE therefore resumed the payment of work-loss benefits, retroactive to March 26, 1978.

In September, 1978, the insurer learned that Mr. Jarosz was receiving the full social security benefits for a retiree who has no work-related income. Ordinarily, retirees over 65 years of age may work full-time and receive social security retirement benefits; however, as wages increase, benefits are reduced according to a statutory formula. The formula calls for the deduction of $1 for every $2 earned over a specified amount. See 42 USC 403(b); 20 CFR 404.401-404.467. Upon learning that Mr. Jarosz was receiving social security benefits computed for a person who was unemployed, DAIIE took the position that it was entitled to deduct from the no-fault work-loss benefits the amount by which the social security benefits would have been reduced had appellant been earning $200 a week and collecting social security benefits. Mr. Jarosz believed that no deduction was permissible and protested the insurance company's deduction of work-loss benefits. When the dispute could not be resolved amicably, Mr. Jarosz filed suit in the circuit court. In May, 1979, DAIIE tendered a check to appellant for an amount which represented a deduction for asserted overpayment of work-loss benefits. Appellant returned the check uncashed.

Appellant moved for summary judgment pursuant to GCR 1963, 117.2(3), claiming that there was no genuine issue concerning the material fact that DAIIE was not entitled to deduct any amount from no-fault benefits upon the basis of the amount of social security benefits he was entitled to receive. The trial court denied the motion by letter, and on March 13, 1980, granted the defendant's corresponding motion for summary judgment, declaring:

"[T]he defendant can take into account social security benefits received by plaintiff to the extent that plaintiff is made whole, as it is the intent of the law to put the injured party in the same position that he would have been had there been no injury."

Mr. Jarosz appealed.

In the Court of Appeals and before this Court, the insurer argued that this case turns upon the correct interpretation and application of § 3107 which defines the meaning of "work loss" and mandates the payment of no-fault work-loss benefits. According to appellee, a correct computation of Mr. Jarosz's "loss of income" for purposes of determining the amount of work-loss benefits due under § 3107 would reveal that his income actually increased as a result of the accident. This is so, appellee argues, because the combination of *full* social security benefits and no-fault work-loss benefits computed on the basis of a loss of $200 per week salary is greater than the total of $200 per week salary and the *reduced* social security benefits for a working retiree, which is what he would have received had he not been injured and had been working at Supreme Steel.

Since, according to DAIIE, one of the purposes of the no-fault act is to restore an injured party to

the position in which he would have been had he not been injured, but no better position, the no-fault work-loss benefits due under § 3107 should be reduced to an amount which, when taken together with the full social security benefits appellant is receiving, would restore him to the position in which he would have been had there been no accident. DAIIE claims that the financial effect upon Mr. Jarosz of reducing the no-fault benefits is identical to the result that would obtain had appellant not been injured and had been receiving social security benefits in the reduced amount to which he would have been entitled if he had earned wages of $200 per week.

The Court of Appeals preferred to rest its analysis and decision upon § 3109(1), but concluded that the insurer's proposed result was correct: DAIIE was entitled under § 3109(1) to subtract from the no-fault work-loss benefits otherwise due an amount equal to the portion of social security benefits representing the differential described above because that amount duplicated the no-fault work-loss benefits.[2]

We granted appellant's application for leave to appeal.[3]

Like the Court of Appeals, we think this litigation is correctly analyzed under § 3109(1) of the no-fault act and not § 3107. Nevertheless, in Part III, we will address DAIIE's § 3107 theory.

II

While we have not considered a case involving facts precisely duplicating those presented by this case, resolution of the legal problem, as we per-

[2] 109 Mich App 86; 310 NW2d 903 (1981).
[3] 414 Mich 872 (1982).

ceive it, does not require us to navigate entirely uncharted waters. We have considered the application of § 3109(1) in other factual settings,[4] and in each case we have been required, as we are here, to determine whether governmental benefits of various kinds must be deducted from no-fault personal protection income benefits otherwise due. To repeat, § 3109(1) provides:

"Benefits provided or required to be provided under the laws of any state or the federal government shall be subtracted from the personal protection insurance benefits otherwise payable for the injury."

The specific question we are required to decide in this case is whether the social security old-age benefits Mr. Jarosz is receiving are the kind of governmental benefits the Legislature intended to be subtracted from no-fault benefits. In answering that question, we take this occasion to delineate a standard or test by which such benefits may be identified in future cases.

## A

Certainly not *all* "[b]enefits provided or required to be provided under the laws of any state or the federal government" must be subtracted from no-fault personal protection insurance benefits otherwise due. Some governmental benefits bear no relationship whatever to no-fault benefits or to the reason no-fault benefits are paid. Benefits bearing

---

[4] *O'Donnell v State Farm Mutual Automobile Ins Co,* 404 Mich 524; 273 NW2d 829 (1979) (social security survivors' benefits) *app dis* 444 US 803; 100 S Ct 22; 62 L Ed 2d 16 (1979); *Mathis v Interstate Motor Freight System,* 408 Mich 164; 289 NW2d 708 (1980) (worker compensation benefits); *LeBlanc v State Farm Mutual Automobile Ins Co,* 410 Mich 173; 301 NW2d 775 (1981), *reh den* 411 Mich 1119; 306 NW2d 311 (1981).

no such relationship are not subject to setoff. Our task is to find a formula by which governmental benefits which are required to be set off under § 3109(1) can be distinguished from those which are not. The task was begun in *O'Donnell v State Farm Mutual Automobile Ins Co,* 404 Mich 524; 273 NW2d 829 (1979). We agree with the Court of Appeals and the parties before us today that *O'Donnell* established the analytical framework from which the standard we seek may be derived. In *O'Donnell,* as in this case, we were confronted with claims that a setoff of governmental benefits against no-fault benefits violated the Equal Protection and Due Process Clauses of the state and federal constitutions.[5] In *O'Donnell,* social security survivors' benefits were involved; here, old-age retirement benefits are involved. We held that social security survivors' benefits were properly deductible from no-fault survivors' benefits under § 3109(1). We were led to that conclusion by a two-step analytical approach: first, we determined whether social security survivors' benefits were the kind of "[b]enefits provided or required to be provided under the laws of any state or the federal government" that the Legislature declared must be subtracted from no-fault benefits under § 3109(1). Second, having decided that they were, we determined whether the legislatively mandated subtraction was constitutional.

In making the first determination in *O'Donnell,* p 544, we observed that

"[t]he history of § 3109(1) indicates that the Legislature's intent was to require a setoff of those government benefits that duplicated the no-fault benefits payable because of the accident and thereby reduce or contain the cost of basic insurance."

---

[5] US Const, Am XIV; Const 1963, art 1, §§ 2, 17.

It was plain, we thought, that survivors' benefits under the federal Social Security Act served substantially the same purpose as no-fault insurance survivors' benefits. Both were meant to compensate persons dependent on the decedent-wage earner by affording them protection from the economic hardship caused by the loss of the wage earner's support. *Id.*, pp 545-546. In addition, they were paid as a result of the decedent's fatal accident. It was clear that the provisions of both the no-fault and the social security plans specifically entitled the beneficiaries to payment of benefits for the same purpose upon the happening of the same event. The social security benefits were duplicative of the no-fault survivors' benefits and thus clearly were subject to setoff under § 3109(1).

The second issue in *O'Donnell,* the constitutionality of § 3109(1), resulted in a determination of the law's validity because, we concluded, the legislative purpose of reducing or containing the cost of no-fault insurance was a matter of legitimate governmental interest and the means chosen, a setoff of duplicate government benefits, was rationally related to that goal. This constitutional standard, that legislation enacted pursuant to the police power bear a rational relationship to a permissible legislative objective, is essentially the same for due process and equal protection analyses. *Shavers v Attorney General,* 402 Mich 554, 612-613; 267 NW2d 72 (1978). Measured against this requirement, we held the setoff of social security survivors' benefits against no-fault survivors' benefits to be constitutional.

Our decision in *O'Donnell,* which we specifically confined to its own facts,[6] provided, therefore, a framework for determining the kinds of govern-

---

[6] *O'Donnell, supra,* p 538, fn 5.

mental benefits which must be subtracted from no-fault benefits under § 3109(1), but did not purport to announce a specific standard or test for application to other kinds of governmental benefits. While our vision down the litigation tunnel is not limitless, we will delineate that standard today in order to enable bench, bar, insurers, and our citizens to predict with greater certainty the financial effect of coordinated no-fault benefits under § 3109(1).

Despite the self-limiting reach of the decision announced in *O'Donnell,* we have cited it as authority for the method by which it is to be determined whether other governmental benefits are within the ambit of § 3109(1).[7] The parties in this case agree as to the application of *O'Donnell's* very generalized standard; they disagree about how it is to be particularized for their case.

Appellant argues that the correct application of § 3109(1) will result in a subtraction of governmental benefits from no-fault benefits when two threshold requirements are met: 1) the state or federal benefits are provided or required to be provided "as a result of the same accident", and 2) they "duplicate in varying degrees the no-fault benefits due".

DAIIE, on the other hand, contends that the proper analysis requires only the one-step determination whether the state or federal benefits duplicate the no-fault benefits and argues that in *O'Donnell* the fact that the social security benefits and no-fault benefits were paid on account of the same accident was not the application of a separate criterion, but only an indication that the benefits were duplicative.[8] DAIIE declares:

---

[7] See *LeBlanc v State Farm Mutual Automobile Ins Co,* 410 Mich 173, 190; 301 NW2d 775 (1981); *Mathis v Interstate Motor Freight System,* 408 Mich 164, 187; 289 NW2d 708 (1980).

[8] As indicated, appellee's theory in this case is that "§ 3109(1) never

"Contrary to the assertions of plaintiff, it is duplication of benefits, not the event which triggers payment, which is the focus of the analysis of the social security benefits in *O'Donnell.* This Court repeatedly emphasized that § 3109(1) was intended to avoid *duplication* of benefits and thus to enable insurers to keep premiums low without harm to beneficiaries. *O'Donnell, supra,* pp 544-546, 547-549. The fact that the benefits at issue in *O'Donnell* were paid as a result of the same accident which resulted in payment of PIP benefits is nothing more than an indication that the benefits are duplicative. It is *not* a separate criterion for application of § 3109(1)." (Emphasis in original.)

We agree with DAIIE's response that the keystone of the correct analysis is whether the benefits are duplicative. However, to complete the analysis, more is required.

## B

We conclude that the correct test is: state or federal benefits "provided or required to be provided" must be deducted from no-fault benefits under § 3109(1) if they:

1) Serve the same purpose as the no-fault benefits,[9] and

2) Are provided or are required to be provided as a result of the same accident.

comes into play here", that the case merely concerns the correct computation of the amount of loss of income under § 3107. See Part III. Appellee did respond, however, in its brief and at oral argument, to the § 3109(1) analysis of the appellant and the Court of Appeals.

[9] This prong of the test requires the Court to determine whether the challenged benefit payment serves the same purpose as the no-fault benefit payment. To be properly deductible under § 3109(1), the challenged benefit payment must serve the same purpose as the no-fault benefit payment. It is not sufficient that the challenged benefit payment has the same *effect* as the no-fault benefit payment; it must have the same *purpose.* It is the purpose, not the effect, which the Court considers in determining whether or not the challenged benefit payment duplicates the no-fault benefit payment.

Some confusion may have been engendered by two statements we made in *O'Donnell* which at first reading may appear to conflict. The first statement comports with the two-step formulation proposed by appellant, and the second more nearly replicates the test we have announced today.

In *O'Donnell,* p 538, we said:

"We conclude that § 3109(1) does require a setoff of these government benefits but is not arbitrary because the benefits are paid as a result of the same accident and duplicate in varying degrees the no-fault benefits otherwise due."

However, we also said:

"The survivors' benefits received pursuant to § 202 of the Social Security Act were likewise paid as a result of the decedent's fatal accident and served substantially the same purpose as the no-fault benefits". *Id.,* p 545.

In isolating the first of the foregoing statements as a correct statement of the test for application of § 3109(1) in other governmental benefit cases, the appellant was mistaken. That statement was concerned with the issue of the constitutionality of the setoff of social security survivors' benefits against no-fault survivors' benefits and not with establishing a standard for determining whether the social security benefits in *O'Donnell* fell within the scope of § 3109(1), as the second statement was. In *O'Donnell,* which was explicitly limited to its facts, the duplicative *nature* of social security survivors' benefits and no-fault survivors' benefits was obvious. We were not primarily concerned, in the first of the quoted statements concerning constitutionality, with enunciating a test for determining the range of comparable benefits covered

by § 3109(1). The test we have formulated today follows, therefore, the analysis we employed in *O'Donnell* in the second statement quoted above and applied in subsequent cases:

"In the leading case concerning § 3109(1), *O'Donnell v State Farm Mutual Automobile Ins Co,* 404 Mich 524; 273 NW2d 829 (1979) * * * [w]e observed that government benefits provided as a result of the same accident for which no-fault benefits are also payable, and which serve the same purpose as no-fault benefits, are within the scope of § 3109(1)". *LeBlanc v State Farm Mutual Automobile Ins Co,* 410 Mich 173, 190; 301 NW2d 775 (1981). See *O'Donnell,* p 545.

See also *Citizens Ins Co of America v Tuttle,* 411 Mich 536, 551, fn 9; 309 NW2d 174 (1981); *Mathis v Interstate Motor Freight System,* 408 Mich 164, 187, fn 7; 289 NW2d 708 (1980).

At the risk of belaboring the point, still another word might be in order to further clarify the standard we announce today and, in the process, to bring a heightened measure of certainty and predictability to the application of this difficult area of no-fault law.

In examining our decisions in *O'Donnell, Mathis,* and *LeBlanc,* it appears that we may have used the word "duplicate", and its adjectival form duplicative, somewhat imprecisely in an effort to characterize the kind of governmental benefits that must be subtracted from no-fault benefits under § 3109(1). We have said, for example, that such benefits are "paid as a result of the same accident *and* duplicate in varying degrees the no-fault benefits otherwise due". *Mathis, supra.* Actually, it is more accurate to conceptualize duplicate benefits as those which satisfy both elements of today's two-pronged test: 1) benefits which serve

the same purpose as no-fault benefits, and 2) benefits which are provided or required to be provided as a result of the same accident. If both criteria are met, the governmental benefit can be said to be duplicative and thus subject to setoff under § 3109(1).[10]

In every case, in order to determine whether the governmental and no-fault benefits serve the same purpose (criterion 1), a particularized assessment of the questioned governmental benefit is necessary to identify the ultimate beneficiary, the nature of the benefits, the reason for paying them, and the events triggering entitlement to them. If an inappropriately generalized notion of purpose or legislative intent is used, it might be concluded that almost any governmental benefit can be seen as duplicating no-fault benefits. For example, at first glance, social security old-age benefits can be seen as a substitute for wages which would otherwise be earned, just as no-fault work-loss benefits are a substitute for wages which would have been earned, and, therefore, both benefits appear to satisfy the first prong of our two-pronged test: benefits which serve the same purpose. More careful analysis reveals, however, that social security old-age benefits are meant to be a substitute for wages earned, but *age,* usually the *age* of the beneficiary, triggers payment and identifies the eligible person. No-fault work-loss benefits, on the other hand, are a substitute for *wages* which a

[10] The goal of any test for offsetting benefits under § 3109(1) is to determine whether the challenged benefit payment "duplicates" the no-fault benefit payment. Both elements of this two-pronged analysis directly test whether the challenged benefits duplicate the no-fault benefits. As this Court has held in other cases, benefits which do not duplicate no-fault benefits are not to be set off under § 3109(1). A finding that the challenged benefit payment does not duplicate the no-fault benefit is not altered by a finding that the claimant is placed ultimately in a "better financial position".

person actually would have earned but for an automobile accident. Clearly, since the occurrence of an accident is totally irrelevant to Congress' social security old-age benefits plan, the legislative purpose or intent regarding the identity of beneficiaries as well as the triggering event for payment of old-age benefits differs from that underlying no-fault work-loss benefits.

Similarly, the fact that benefits are paid as a result of the same accident (criterion 2) is a characteristic of duplicate benefits. To the extent that DAIIE contends that benefits can be duplicative and not paid as a result of the same accident, we disagree. In reality, if benefits are duplicative, then they are paid as a result of the same accident. But the converse is not necessarily true. Put another way, if benefits are not paid as a result of the same accident, they are not duplicative.

To some extent, this second criterion (benefits required to be provided as a result of the same accident) of the two-part test overlaps the first criterion (serving the same purpose). That is inevitable and it is because both are characteristics of duplicative benefits.

Still, we find that application of the two-part test is useful, partly because the event triggering payment is easily verifiable. Moreover, the fact that one can determine easily whether benefits are *not* paid as a result of the same accident provides a quick, accurate method of determining if benefits are not duplicative. In such a case, further analysis of certain benefits thus becomes unnecessary.

Determining whether benefits are paid as a result of the same accident seems self-explanatory. Yet, we will elaborate in order to clarify any misconceptions.

For benefits to be duplicative under the standard

we have announced today, substantially equivalent qualifications and provisions would have to exist. In other words, the federal or state law that provides the governmental benefits or requires them to be provided must specifically base payment of benefits upon the happening of an event, and an automobile accident must qualify as such an event.

This is not to say that federal or state statutes must be identical to no-fault provisions in every way, but they must be substantially the same, at least in the triggering mechanism for payment. For purposes of the second criterion of our two-part test, the benefits received must be contingent upon the occurrence of the same automobile accident.

## C

Applying our two-part test to the facts of this case, we find that the amount in dispute—the difference between what the plaintiff is now receiving and what he would have been paid had he been receiving reduced social security benefits together with wages from Supreme Steel—may not be set off against no-fault work-loss benefits otherwise due. The challenged payment fails both portions of the test. First, this differential amount, although arguably serving the same *general* purpose as no-fault benefits, the prevention of hardship due to lost wages, does not serve the same *particular* purpose as work-loss no-fault benefits. The differential payment challenged in this case was not made because the plaintiff was disabled from work and thereby suffered work loss. It was made because the plaintiff did not have additional income in excess of the statutory limit. For purposes of the disputed differential payment, the

reason why the plaintiff does not have income in excess of the statutory limit is irrelevant; any reason is sufficient and a disabling injury causing work loss is not required. Therefore, the particular purpose served by the differential amount is not the same as the purpose served by the no-fault work-loss benefits. Second, the triggering event for the challenged differential payment is not the disabling automobile accident which triggers the no-fault work-loss payment. Instead, the triggering event for the challenged differential amount is the plaintiff's age.[11] The challenged differential benefit is not "provided or required to be provided" because the plaintiff is disabled; it is only "provided or required to be provided" to persons who have reached 65 years of age. Therefore, the triggering event is not a disabling automobile accident causing work loss; the triggering event is the plaintiff's age. Even assuming that, but for the accident, the plaintiff would not have received the disputed amount, the accident is not the triggering event since the accident alone will not precipitate payment of the disputed benefit. The disputed payments are made only if the plaintiff does not have outside income in excess of the statutory limits, for whatever reason, *and* the plaintiff has reached 65

[11] It is Justice LEVIN's view that the benefits are payable because of the automobile accident and not just because the claimant is over 65 years of age. While we agree that the benefits are not payable solely because the claimant is over 65 years of age and that the payments would be reduced if the claimant were earning in excess of an established amount, we do not agree that the reason for the payment is the claimant's automobile accident. Rather, the reason for the payment is the fact that the claimant does not earn in excess of the federally established maximum. Whether the claimant does not earn more than the federally established maximum because of a disability or because of a choice to be fully retired is not relevant in determining the amount of the claimant's payments. The only relevant factor is that the claimant does not earn in excess of the federally established maximum. Therefore, the "reason" for the payment is not the disability; it is the fact that the claimant earns less than the federally established maximum.

years of age. Therefore, it is the confluence of purpose and triggering event which demonstrates that the governmental benefits in question fail to meet the two parts of the *O'Donnell* test as we have restated it today. Therefore, the challenged benefits do not duplicate no-fault work-loss benefits.

### III

DAIIE's primary argument is that Mr. Jarosz's social security benefits must be considered in determining the amount of loss of income as a result of the accident, for the purpose of determining no-fault "work loss" benefits under MCL 500.3107; MSA 24.13107.

DAIIE's innovative analytical approach to this case, offered for the first time in the Court of Appeals and repeated before this Court in oral argument, is that "§ 3109 never comes into play here". Instead, the insurer argues, Mr. Jarosz's social security benefits must be considered in determining the amount of loss of income that resulted from the accident for the purpose of determining the amount of no-fault work-loss benefits due under § 3107. According to DAIIE, because of Mr. Jarosz's social security benefits, he is actually receiving, together with his no-fault work-loss benefits, more money than he would be receiving if he were working at Supreme Steel and collecting reduced social security benefits. Consequently, DAIIE asserts, Mr. Jarosz has no actual loss of income as a result of the accident. Thus, his work-loss benefits should be reduced until the combination of benefits equals what he would have been receiving if he were working.

What DAIIE fails to recognize is that work-loss

benefits are paid for loss of income from loss of work. Section 3107 provides:

"Personal protection insurance benefits are payable for the following:

* * *

"(b) Work loss consisting of income from work an injured person would have performed during the first 3 years after the date of the accident if he had not been injured".

Social security old-age benefits may arguably be income, but they are not income from work. The fact that Mr. Jarosz has income in the form of social security old-age benefits does not, in any way, vitiate the fact that he has lost income from work.

We find that the manifest intent of the Legislature was to define "work loss" under § 3107 as income loss attributable solely to the inability to work without regard to non-work-related sources of income. To the extent that the Legislature shares DAIIE's concern that an insured should not be financially better off not working after an accident than while working before the accident, it has addressed the subject in § 3109 and has provided for the coordination and setoff of certain kinds of benefits according to the formula we have discussed.

The decision of the Court of Appeals is reversed and the trial court's summary judgment for the appellee is vacated. Summary judgment for the appellant on the issue whether appellee is entitled to set off social security benefits against no-fault work-loss payments is granted. The case is remanded to the circuit court for proceedings consistent with this opinion.

WILLIAMS, C.J., and CAVANAGH and BOYLE, JJ., concurred with RYAN, J.

LEVIN, J. *(dissenting).* This appeal concerns the coordination of social security retirement and no-fault benefits.

The majority holds that social security retirement benefits are not "[b]enefits provided or required to be provided under the laws of any state or the federal government", required by § 3109(1) of the no-fault automobile liability act to be subtracted from work-loss benefits payable by a no-fault insurer to an injured person.[1]

The majority distinguishes social security *retirement* benefits from workers' compensation benefits, required to be subtracted in *Mathis v Interstate Motor Freight System,* 408 Mich 164, 187; 289 NW2d 708 (1980), social security *survivors'* benefits, required to be subtracted in *O'Donnell v State Farm Mutual Automobile Ins Co,* 404 Mich 524, 546; 273 NW2d 829 (1979), *app dis* 444 US 803; 100 S Ct 22; 62 L Ed 2d 16 (1979),[2] and social security *disability* benefits, required to be subtracted in *Thompson v DAIIE,* 418 Mich 610; 344 NW2d 764 (1984), on the ground that social security retirement benefits become payable upon attainment of age 65 without regard to whether the worker has suffered an injury or disability, and may become payable although the worker continues to have income from wages.[3]

Section 3109(1) of the no-fault act provides:

---

[1] See text accompanying fn 4.

[2] The constitutionality of setting off social security payments, for which the beneficiary has already "paid" through contributions to the social security system, was sustained by this Court in *O'Donnell v State Farm Mutual Automobile Ins Co, supra.*

[3] See fns 22-23 and accompanying text.

"Benefits provided or required to be provided under the laws of any state or the federal government shall be subtracted from the personal protection insurance benefits otherwise payable for the injury."[4]

We acknowledge that while a literal reading of the term "benefits" would require the subtraction from no-fault benefits of all benefits provided by federal law, the Court may properly limit the breadth of the term "benefits" to the meaning that the history or the structure of the act indicates the Legislature intended. The majority does not, however, claim that anything in the history or the structure of the act justifies limiting the term "benefits" to disability, survivors', or injury-related benefits.[5]

The legislative history of the act demonstrates that:

---

[4] MCL 500.3109(1); MSA 24.13109(1).

[5] The majority opinion does not consider the legislative history, but rather begins with an assumption. The majority opinion assumes that "[c]ertainly not *all* '[b]enefits provided or required to be provided under the laws of any state or the federal government' must be subtracted from no-fault personal protection benefits otherwise due". *Ante,* p 573. (Emphasis in original.) The basis of that assumption is not stated.

*O'Donnell* responded to due process and equal protection challenges. See fn 13. The majority opinion adopts the *O'Donnell* analysis as a limiting construction of the term "benefits". The holding in *O'Donnell, supra,* p 545, that the constitution was not violated under the circumstances that the social security survivors' benefits there involved were "paid as a result of the [same] accident and served substantially the same purpose as the no-fault benefits", did not imply either (i) that it would be violative of the Equal Protection or Due Process Clauses to subtract from no-fault benefits a benefit paid by or mandated by government that was not paid as a result of the same accident or that served a purpose other than the purpose served by no-fault benefits, or (ii) that the Legislature intended that there only be subtracted benefits paid as a result of the same accident or that served the same purpose as no-fault benefits.

Nor did the Court in *Mathis, supra,* or *LeBlanc v State Farm Mutual Automobile Ins Co,* 410 Mich 173; 301 NW2d 775 (1981), adopt *O'Donnell's* constitutional analysis as a construction of the term "benefits". *Mathis* posed the construction issue but responded in terms only to the equal protection and due process challenges, and *LeBlanc* avoided resting decision on § 3109(1) by concluding that

1) In commenting upon the coordination provision of one proposed no-fault bill that provided only for the subtraction of "workers' compensation" benefits, the Commissioner of Insurance observed in a letter to the Governor that the provision tended to "increase the duplication and overlap between auto insurance and other insurance programs, sick leave programs and social security". The commissioner proposed striking the words "workmen's compensation", so that the coordination provision would require the subtraction of "benefits recoverable under the laws of any state or the federal government",[6] language that parallels § 3109(1).

2) The bill that was eventually enacted, as originally introduced, provided for the subtraction of

§ 3109a governed. Thus, today's decision is the first construction of § 3109(1) (see fn 13) as it is the first holding by this Court that a government benefit is not a "benefit" within the meaning of § 3109(1).

Converting the Court's constitutional analysis in *O'Donnell* into a limitation narrowing the meaning of § 3109(1), absent a decision by this Court that § 3109(1) would be unconstitutional if more broadly construed, has not been justified.

[6] Several bills designed to establish a no-fault automobile insurance system were introduced into both the House and the Senate during the 1971-1972 legislative session. House Bills Nos. 4734, 4735, 4736, and 4737 were introduced on April 7, 1971. 1 House J (1971), pp 783-784. House Bill No. 4847 was introduced on April 23, 1971. 1 House J (1971), p 900. Senate Bills Nos. 4 and 6 were introduced on January 13, 1971. 1 Senate J (1971), pp 23-24. Senate Bill No. 520 was introduced on April 26, 1971. 1 Senate J (1971), p 663. Senate Bill No. 695 was introduced on May 17, 1971. 1 Senate J (1971), p 868. Senate Bill No. 782 was introduced on June 2, 1971. 1 Senate J (1971), pp 1000-1001.

House Bill No. 4734, as introduced, provided in § 3013(1)(C) that "[b]enefits recoverable under the workmen's compensation laws of any state or the federal government shall be deducted from the benefits afforded under the basic coverage herein prescribed". It was this provision that the Commissioner of Insurance criticized in the letter to the Governor cited and relied upon by this Court in *O'Donnell, supra,* pp 544-545. See letter from Russell E. Van Hooser, Michigan Commissioner of Insurance, to Governor Milliken (June 4, 1971) concerning analysis of House Bills Nos. 4734, 4735, 4736, and 4737, pp 3-4.

only social security "disability and survivors' "
benefits.[7]

3) In conference, the House bill, that would have
limited the subtraction to benefits provided or
required to be provided "because of the injury",
was rejected in favor of the Senate bill, not con-
taining such a limitation, that was enacted.[8]

---

[7] The no-fault bill that was eventually enacted was Senate Bill No.
782, which was introduced in the Senate on June 2, 1971. See fn 6.

As originally introduced, § 9(1) of that bill provided as follows:

"The amount of *disability and survivor benefits* a claimant recovers
or is entitled to recover under the social security act, United States
Code, title 42, sections 301 *et seq.,* because of accidental bodily injury
shall be subtracted from the *personal protection insurance* benefits
otherwise payable for the injury." (Emphasis added.)

Under the original bill, then, all social security disability and survi-
vor benefits paid to a no-fault claimant would be subtracted from the
claimant's no-fault recovery, whereas no social security retirement
benefits would be subtracted.

The Senate Commerce Committee, however, did not adopt Senate
Bill No. 782 as originally introduced, but rather reported favorably on
a substitute version of the bill. 2 Senate J (1972), p 1275. The
pertinent provision of the substitute bill, § 3109(1), provided:

"*Benefits* provided or required to be provided under the laws of any
state or the federal government shall be subtracted from the personal
protection insurance benefits otherwise payable for the injury." (Em-
phasis added.)

This was the provision that was eventually enacted into law. Thus the
Senate Commerce Committee expressly rejected a provision that
would have limited subtraction to social security disability and survi-
vor benefits, and replaced it with a provision the literal terms of
which encompass social security retirement benefits as well. This
legislative action cannot be reconciled with the conclusion of the
majority opinion that social security retirement benefits do not fall
within the ambit of § 3109(1).

[8] After the Senate voted favorably on Senate Bill No. 782, 2 Senate
J (1972), p 1392, the measure proceeded to the House. 3 House J
(1972), p 2157. Although voting favorably on the concept of no-fault
automobile insurance, the House Insurance Committee chose to adopt
its own substitute version of Senate Bill No. 782, 3 House J (1972), p
2786, which the House passed by a vote of 84-19. 3 House J (1972), p
2829. The relevant provision of the House substitute was § 3125(1),
which provided:

4) § 3109(1) is modeled on a section of the Uniform Motor Vehicle Accident Reparations Act (UMVARA) that provides for the subtraction of social security retirement benefits.[9]

Section 3109(1) is the broadest alternative source reduction provision in any no-fault legislation. Schermer, *Automobile Liability Insurance* (2d ed), § 8.05, p 8-16. The Legislature chose not to adopt

"In calculating net loss, all benefits provided or required to be provided *because of the injury* under the laws of any state or the federal government, other than this chapter, are subtracted." (Emphasis added.)

The conference committee that was created to reconcile the differences between the two no-fault bills opted for the setoff provision that had been adopted by the Senate. 2 Senate J (1972), p 2005. Both the Senate and the House adopted the conference committee's recommendations, *id.,* pp 2005-2006; 4 House J (1972), p 2971.

Thus the conference committee, and subsequently both chambers of the Legislature, rejected a provision that would have limited the subtraction to benefits provided "because of the injury", and replaced it with a provision the literal terms of which authorize the subtraction of all government benefits regardless of the reason those benefits are paid. This legislative action cannot be reconciled with the conclusion of the majority opinion that only governmentally mandated disability, injury-related, or survivors' benefits may be subtracted from no-fault benefits otherwise payable.

[9] UMVARA provides:

"(a) All benefits or advantages a person receives or is entitled to receive because of the injury from social security, workmen's compensation, and any state-required temporary, nonoccupational disability insurance are subtracted in calculating net loss." 14 ULA, § 11, p 78.

The Commissioners' Comment to this section states:

"Subsection (a) concerns the effects of collateral sources of benefits on the right to receive reparation benefits under this Act. In calculating net loss for the purpose of determining reparation benefits one must subtract only those benefits or advantages he is entitled to receive from (1) social security, (2) workmen's compensation, and (3) state-required temporary nonoccupational disability insurance (sometimes referred to as cash sickness benefits). *'Social security' includes all benefits under the federal Social Security Act, including Medicare and disability benefits.* It does not include benefits provided under Title XIX of the Social Security Act ('Medicaid'), which are not paid through the Social Security System. As to social security benefits, a generic term is used rather than statutory citation so that this Act need not be amended to conform to later amendments to the Social Security Act." *Id.,* pp 78-79. (Emphasis supplied.)

any of the more limited setoff provisions contained in no-fault laws which had been enacted or were pending before other state legislatures across the country[10] or that were introduced during the extended legislative consideration of the no-fault act.[11] In enacting a more general, less specific, coordination provision than the provisions in the UMVARA and in bills given active legislative consideration, the Legislature provided no support for the view adopted by the majority that social security retirement benefits are not required to be coordinated.

In confining the operative effect of the term "benefits" to workers' compensation, survivors', and disability benefits payable because of an automobile injury, the Court reads into the no-fault act limitations found in the New York no-fault act[12] that the Legislature, rejecting several efforts to

---

[10] Most no-fault statutes specifically identify the government payments that are to be subtracted from no-fault benefits. See Gretzinger, *O'Donnell v State Farm Mutual Insurance Co: A Judicial Attempt to Amend Michigan's No-Fault Act,* 1977 Det C of L Rev 187, 188-191, and fns 18-29.

[11] See fns 6-8 and accompanying text.

[12] The no-fault statute of the State of New York, as relevant here, is essentially identical to Senate Bill No. 782 as originally introduced. NY Insurance Law, 671(2) (McKinney) provides:

" 'First party benefits' means payments to reimburse a person for basic economic loss on account of personal injury arising out of the use or operation of a motor vehicle, less * * * amounts recovered or recoverable *on account of such injury* under state or federal laws providing *social security disability benefits,* or workmen's compensation benefits, or disability benefits under article nine of the workmen's compensation law, or medicare benefits (other than lifetime reserve days and provided further that the medicare benefits utilized herein do not result in a reduction of such person's medicare benefits for a subsequent illness or injury)". (Emphasis supplied.)

Thus the New York Legislature, by statutorily limiting its setoff provision to social security disability benefits and excluding social security retirement benefits, enacted the setoff provision that was rejected by the Michigan Legislature. The majority opinion in effect transforms the coordination provision of the Michigan no-fault act so that it has the meaning specifically stated in the New York act.

impose such limitations, rejected in favor of the unmodified, all-encompassing term "benefits".

Nevertheless, we recognize, as suggested in *O'Donnell, supra,* p 546, that the Legislature may have intended that there be subtracted only those benefits that are "duplicative",[13] and that, depend-

---

[13] While *O'Donnell v State Farm Mutual Automobile Ins Co, supra,* p 544, states that the Legislature intended to require a subtraction of "government benefits that duplicated the no-fault benefits payable because of the accident", this Court has not heretofore held either that the Legislature did not intend or could not constitutionally require the subtraction of governmentally mandated benefits that do not duplicate no-fault benefits, *i.e.,* that do not (in the work-loss context) replace income from work an injured person would have performed if he had not been injured.

In stating that the legislative history of the no-fault act indicated an intent to require a subtraction of duplicative government benefits, the Court in *O'Donnell* did not state that only duplicative government benefits could be subtracted. The *O'Donnell* opinion was "confined to the facts before the Court and [did] not purport to encompass other possible government benefits", *supra,* p 538.

Questions concerning the scope and type of benefits that may be subtracted from no-fault work-loss benefits "were unnecessary to the decision in *O'Donnell*", *Mathis v Interstate Motor Freight System, supra,* p 189 (Moody, J., *concurring in the results*). Cf. *LeBlanc v State Farm Mutual Automobile Ins Co,* fn 5 *supra,* pp 228-229 (Ryan, J., *dissenting*). The briefs in *O'Donnell* and the companion cases posed constitutional, not statutory construction, issues. The statements in *O'Donnell* regarding the scope of § 3109(1) were made to provide a foundation for reaching the constitutional issues; it was necessary for the Court to decide—whether or not argued by counsel—that survivors' benefits were within the scope of § 3109(1) before it could properly reach the constitutional issues. In *Mathis,* this Court's grant of leave to appeal was explicitly limited to the constitutionality (not the scope) of § 3109(1). 403 Mich 852 (1978). DAIIE's failure to contend, in the instant case, that government benefits that are not "duplicative" are nevertheless required to be subtracted under § 3109(1) makes it unnecessary to decide, as a matter of constitutional or statutory analysis, whether non-duplicative benefits are required to be subtracted.

In this connection it is noteworthy that general taxes, social security taxes paid by employers and employees, workers' compensation insurance premiums paid by employers, and no-fault automobile insurance premiums paid by the owners of motor vehicles are all government exactions that provide funds for income maintenance payments to persons who otherwise might not have the wherewithal for an adequate sustenance. A legislative intent to require coordination of all governmentally mandated income maintenance benefits may be both rational and constitutional even if in application such

ing on the meaning given the term "duplicative", the benefit paid to a veteran for a war injury or the portion of a social security retirement benefit that is paid although the recipient has income from wages may be beyond the intendment of the term "benefits" as used in § 3109(1).

The social security retirement benefits at issue in this case, however, would not have been paid to Jarosz if he had not been injured in the automobile accident and unable to work at his post-retirement job. DAIIE did not subtract the portion of the social security retirement payment that Jarosz receives solely because he is 65 years old, and that he would receive even if he were earning income from wages at a post-retirement job. Rather, the amount that is at issue in this case is the portion of the social security retirement payment that Jarosz receives solely because he lost income ($200 per week) for work he would have performed at a post-retirement job if he had not been injured.

Social security retirement benefits that would not be paid if the person over 65 had not been injured in an automobile accident and had been working are functionally and essentially the same as the workers' compensation benefits dealt with in *Mathis,* the social security survivors' benefits dealt with in *O'Donnell,* and the social security disability benefits dealt with in *Thompson.* But for the automobile accident and the resulting injury or disability, such social security retirement benefits would not have been paid. Such social security retirement benefits serve the same income maintenance and replacement purpose served by workers' compensation benefits, social security survivors'

coordination has a differing impact upon the incomes of persons affected by the various statutory programs. See *Great American Ins Co v Queen,* 410 Mich 73, 97; 300 NW2d 895 (1980).

and disability benefits, and no-fault work-loss benefits.

The majority opinion—holding that because in some other case social security retirement benefits may become payable without regard to injury/disability or wage loss, all social security retirement benefits (including those that would not be payable but for wage loss resulting from automobile injury/disability) are not benefits within the meaning of § 3109(1)—appears to have adopted the analysis (i) expressed in the dissent in *Cruz v Chevrolet Grey Iron Division of General Motors Corp,* 398 Mich 117, 160; 247 NW2d 764 (1976), where this Court held that the coordination of social security and workers' compensation benefits was not violative of the Equal Protection Clause,[14] and (ii) re-

---

[14] "It is clear, however, that insofar as the Michigan statute may have been designed to avoid duplication of benefits, it has not been appropriately drawn. It is apparent both from the age at which reductions begin, and from the 1974 amendment, that the Legislature was concerned about receipt of both federal old age and survivors' benefits and our state workers' compensation payments. The concern is misplaced, however, because these benefits are not duplicative.

"Whereas federal social security disability insurance and workers' compensation benefits are in a sense double payment because they both are designed to deal with disability, the federal social security old age and survivors' benefit is meant to supplement or, in some cases, substitute for private pension benefits, not disability benefits. *Old age and survivor benefits are triggered by retirement because of age, not because of injury.*

* * *

"Thus, the conditions of payment for workers' compensation benefits have a completely different nature from old age and survivors' benefits. The source of funds differs as well. Compare 42 USC 401 and MCL 418.601 *et seq.;* MSA 17.237(601) *et seq.*

"Therefore, workers' compensation deals with disability. Old age and survivors' benefits do not. Thus, in no sense do the two duplicate each other. Because old age and survivors' benefits and workers' compensation payments are distributed for different reasons, from different funds, the legislative purpose of avoiding dual benefits is not at all related to the statutory provision, because the statute does not address itself to, nor deal with, dual benefits." *Cruz v Chevrolet Grey Iron Division of General Motors Corp,* 398 Mich 117, 160-162; 247 NW2d 764 (1976) (WILLIAMS, J., *dissenting).* (Emphasis added.)

jected in *Alessi v Raybestos-Manhattan, Inc,* 451 US 504; 101 S Ct 1895; 68 L Ed 2d 402 (1981), where the United States Supreme Court held that workers' compensation benefits may, consistent with the Employee Retirement Income Security Act, be subtracted from benefits otherwise payable pursuant to an employer's pension plan.[15]

Recognizing that it may be appropriate to limit the generality of the term "benefits" to exclude government payments that would be paid even if there had not been wage loss resulting from an automobile accident, and which in that sense are *not* "duplicative", we would hold that at least the social security retirement benefits at issue in this case are required to be subtracted pursuant to § 3109(1) because they would not have been paid but for the automobile accident and Jarosz's resulting injury/disability and inability to earn wages at his post-retirement job, and in that sense are duplicative of the no-fault benefits paid because of his inability to earn wages at his post-retirement job.

I

On June 27, 1977, Joseph W. Jarosz suffered

[15] The United States Supreme Court responded to arguments reminiscent of those made in the majority opinion in this case:

"Developing this argument, retirees claim that workers' compensation provides payments for work-related injuries, while Social Security and Railroad Retirement supply payments solely for wages lost due to retirement. Because of this distinction, retirees conclude that integration of pension funds with workers' compensation awards lacks the rationale behind integration of pension funds with Social Security and Railroad Retirement. Retirees' claim presumes that ERISA permits integration with Social Security or Railroad Retirement only where there is an identity between the purposes of pension payments and the purposes of the other integrated benefits. But not even the funds that the Congress clearly has approved for integration purposes share the identity of purpose ascribed to them by petitioners. Both the Social Security and Railroad Retirement Acts provide payments for disability as well as for wages lost due to retirement, and ERISA permits pension integration without distinguishing these different kinds of benefits." *Alessi v Raybestos-Manhattan, Inc, supra,* pp 518-519.

injuries in an automobile accident that prevented him from working at his job as a store manager. Detroit Automobile Inter-Insurance Exchange, the no-fault insurer, paid him work-loss benefits based on his salary of $285 per week. A few months after the accident, Jarosz became 65 and was mandatorily retired pursuant to company policy. He then began receiving social security retirement payments based on the amount to which he was entitled as an unemployed retiree.

DAIIE terminated the payment of work-loss benefits because of Jarosz's retirement. The no-fault act provides that work-loss benefits are paid for "loss of income from work an injured person *would have performed * * * if he had not been injured*".[16] (Emphasis supplied.) Jarosz provided evidence to DAIIE that, but for the accident, he would, after retirement, have gone to work for another company and earned $200 per week ($10,400 per year). DAIIE thereupon resumed payment

[16] MCL 500.3107(b); MSA 24.13107(b). As of October 1, 1983, the ceiling on no-fault work-loss benefits is $2,252 per month for three years.

" 'Work loss', as are the other components of loss, is restricted to accrued loss, and thus covers only actual loss of earnings as contrasted to loss of earning capacity. Thus, an unemployed person suffers no work loss from injury until the time he would have been employed but for his injury. On the other hand, an employed person who loses time from work he would have performed had he not been injured has suffered work loss, even if his employer continues his wages under a formal wage continuation plan or as a gratuity. Employer payments in this situation are collateral source payments rather than wages since they are not payments for work done during the time the employee was absent. Nor would the wage continuation payments be subtracted in the calculation of net loss. (See Section 11). Work loss is not restricted to the injured person's wage level at the time of injury. For example, an unemployed college student who was permanently disabled could claim loss, at an appropriate time after the injury, for work he would then be performing had he not been injured. Conversely, an employed person's claim for work loss would be appropriately adjusted *at the time he would have retired from his employment.*" (Emphasis supplied.) Commissioners' Comment to the Uniform Motor Vehicle Accident Reparations Act, 14 ULA, § 1(a)(5)(ii), p 54.

of work-loss benefits based on a "salary" of $200 per week.

Because Jarosz did not, as a result of the accident, actually begin to work at the new job, he continued to receive social security retirement payments at the rate calculated for an unemployed retiree. DAIIE learned of the social security payments and reduced its check to Jarosz by the amount the social security payment would have been reduced had Jarosz been earning $200 per week at the new job. Jarosz refused to accept the reduced amount and filed this action.[17]

## II

In *O'Donnell v State Farm Mutual Automobile Ins Co, supra,* p 544, this Court said that the Legislature intended "to require a setoff of those government benefits that duplicated the no-fault benefits payable because of the accident and thereby reduce or contain the cost of basic insurance". Similarly, see *Mathis v Interstate Motor Freight System, supra,* p 187; *LeBlanc v State Farm Mutual Automobile Ins Co,* 410 Mich 173, 191; 301 NW2d 775 (1981). *Cf. Great American Ins Co v Queen,* 410 Mich 73; 300 NW2d 895 (1980).

If, despite the all-encompassing language of § 3109(1), the term "benefits" is to be limited on the authority of *O'Donnell* to those government payments that are "duplicative", the term "dupli-

---

[17] Jarosz moved for summary judgment pursuant to GCR 1963, 117.2(2), claiming that there was no genuine issue of material fact as to whether DAIIE could offset any portion of the social security retirement benefits paid to Jarosz; the circuit court denied Jarosz's motion on November 20, 1979. On March 13, 1980, the court entered a final order of summary judgment in DAIIE's favor permitting the subtraction of the social security retirement payments here in issue.

The Court of Appeals affirmed. *Jarosz v DAIIE,* 109 Mich App 86; 310 NW2d 903 (1981). This Court granted leave to appeal. 414 Mich 872 (1982).

cative" should be given a meaning consistent with
the meaning that appears to have been intended
in *O'Donnell.* There the Court relied on the letter
previously referred to from the Commissioner of
Insurance to the Governor to support its statement
that the history of § 3109(1) indicates a legislative
intent to require the setoff of "government benefits
that duplicated the no-fault benefits payable be-
cause of the accident"; the Court noted that the
letter "criticized [certain proposed] bills because
they tended to 'increase the duplication and over-
lap between auto insurance and other insurance
programs, sick leave programs and *social
security'*". *O'Donnell, supra,* p 544 (emphasis sup-
plied).[18] The Court continued that "[t]he final ver-
sion of § 3109(1) was similar to an amendment
suggested by the Commissioner", who recom-
mended that the provision read "benefits recover-
able under the laws of any state or the federal
government". Thus the effort to eliminate "dupli-

[18] "One of the most important principles of statutory interpretation
is that the words of the statute should be construed in light of the
Legislature's intent. See, *e.g., Moore v Dep't of Military Affairs,* 398
Mich 324; 247 NW2d 801 (1976). The history of § 3109(1) indicates
that the *Legislature's intent* was to require a set-off of those govern-
ment benefits that *duplicated* the no-fault benefits payable *because of
the accident* and thereby reduce or contain the cost of basic insur-
ance. [Emphasis supplied.]

"In a letter to the Governor from the Commissioner of Insurance
analyzing a series of proposed no-fault bills introduced in 1971, none
of which contained a set-off provision, the Commissioner criticized the
bills because they tended to 'increase the duplication and overlap
between auto insurance and other insurance programs, sick leave
programs and social security'. * * * The final version of § 3109(1) was
similar to an amendment suggested by the Commissioner. According
to the Commissioner, the purpose of the amendment was 'to provide a
more complete and effective coordination of benefits between Michi-
gan auto insurance and the benefits provided by the laws of all the
states and the federal government'. As noted by Justice WILLIAMS in
his opinion in this case, the Commissioner's comments 'make clear
that the purpose of the § 3109(1) statutory scheme was framed in
terms of maintaining or reducing premium costs for all insureds
through the elimination of duplicative benefits recovery'." *O'Donnell
v State Farm Mutual Automobile Ins Co,* pp 544-545.

cation" did not distinguish between social security disability and survivors' benefits, on the one hand, and social security retirement benefits, on the other.

Further, the term "duplicative" should be given a meaning consistent with the underlying purpose of the no-fault act. The Legislature provided work-loss benefits to an injured person to replace "loss of income from work an injured person would have performed if he had not been injured".[19] Consistent with this purpose, those governmentally mandated payments—including social security retirement payments—that, like the work-loss benefits provided by the no-fault act, replace income from work the injured person would have performed if he had not been injured are "duplicative" of the no-fault work-loss benefits and are "benefits" within the meaning of § 3109(1).[20]

Treating governmentally mandated payments as "benefits" within the meaning of § 3109(1) to the extent they replace income from work an injured person would have performed if he had not been injured is consistent with the results this Court has reached in other cases. In *O'Donnell, supra,* p 546, the Court referred to the United States Supreme Court's statement in *Mathews v De Castro,* 429 US 181, 185-186; 97 S Ct 431; 50 L Ed 2d 389 (1976), that social security survivors' payments "were intended to provide persons dependent on

[19] See fn 16 *supra.*

[20] The term "benefits", as so defined, includes government payments that, like no-fault work-loss benefits, have the *effect* of replacing income from work the injured person would have performed if he had not been injured. Such government payments are required to be subtracted from a no-fault recovery pursuant to § 3109(1). To the extent that, but for an automobile accident, government payments would no longer be provided, the payments have the same effect of replacing income lost as a result of the accident, and they should be subtracted from no-fault benefits pursuant to § 3109(1).

the wage earner with protection against the eco-
nomic hardship occasioned by loss of the wage
earner's support", and concluded that social secu-
rity survivors' payments, like the work-loss bene-
fits provided by the no-fault act, replace income
lost as a result of the wage earner's fatal automo-
bile accident. In *Mathis v Interstate Motor Freight
System, supra,* the payments made under the
workers' compensation act replaced lost wages
attributable to the accident, and this Court held
that workers' compensation payments are required
by § 3109(1) to be subtracted. In the companion
case of *Thompson v DAIIE, supra,* this Court holds
that social security disability benefits paid to de-
pendents replace lost income from wages and are
required to be subtracted.

### III

The majority declares that "state or federal
benefits 'provided or required to be provided' must
be deducted from no-fault benefits under § 3109(1)
if they:

1) Serve the same purpose as the no-fault bene-
fits, and

2) Are provided or are required to be provided as
a result of the same accident."[21]

The social security retirement payments at issue
here satisfy both of these criteria.

### A

The social security retirement payments at issue
in this case were paid only because Jarosz lost
income from work and thus serve the same pur-

---

[21] *Ante,* p 577.

pose as no-fault work-loss benefits which also are only payable for loss of income from work.

Jarosz would, to be sure, have received some social security payments simply by virtue of having reached his 65th birthday even if he had been able to continue to work. A person who is 65 years old is entitled to full social security payments as long as any earnings he receives from work do not exceed the exempt earnings ceiling (which in 1983 was $6,600).[22] Even if a person is 65 years old and continues to earn an income greater than the exempt earnings ceiling, he may still receive some social security payments, but the payments will be reduced by $1 for every $2 earned in excess of the exempt earnings ceiling.[23]

DAIIE did not subtract the payments that Jarosz would receive, as a person over 65, even if he continued to work, and therefore those payments are not at issue in this case. The sum which DAIIE subtracted equals the portion of the social security retirement benefits that would not have been paid to Jarosz if he had been working at his post-retirement job.

When Jarosz reached 65, he became entitled to social security retirement payments consisting of two components: (1) the component paid solely because he was 65 years old; and (2) the component paid because, as a result of the accident that

---

[22] 42 USC 403; 20 CFR 404.430. See also *Social Security Explained* (CCH, 1983), § 525.1, p 216. The 1984 ceiling is $6,960.

The ceilings on exempt annual earnings for the years involved in the instant case were: $4,000 for 1977 and 1978; $4,500 for 1979; and $5,000 for 1980. McCormick, Social Security Claims and Procedures (3d ed), § 318, p 323, fn 1.

A worker who is 70 years old may earn any amount of wages without a reduction of his social security benefits. *Social Security Explained, supra,* p 217.

[23] 42 USC 403; 20 CFR 404.430. See also *Social Security Explained,* fn 22 *supra,* p 215.

occurred before he was 65, he was unable at 65 to work at his post-retirement job and thus lost income from wages. If Jarosz had not been injured in the automobile accident and had been able to work at his post-retirement job earning $200 per week, he would not be entitled to receive the social security payments DAIIE seeks to subtract from the no-fault benefits—component (2)—although he is 65 years old.

Neither the social security retirement payments here in issue nor the no-fault work-loss benefits would be payable but for Jarosz's inability, as a result of the accident, to work at the $200 per week post-retirement job, and thus they both serve the same purpose of replacing income that he would have earned had he been able to work at the post-retirement job. The social security retirement payments *at issue in this case* are paid to Jarosz not because he is 65 years of age, but rather because he has lost income from wages as a result of the accident.

If a worker is less than 65 years old and has lost income from wages because of disability, the social security system provides disability payments to replace that lost income; such payments are labeled social security *disability* benefits rather than social security *retirement* benefits, but, when payable, are paid in substantially the same amount as retirement benefits calculated at the same time.[24] To the extent post-65 social security retirement payments replace lost income they serve the same purpose as pre-65 social security disability payments that this Court holds must be subtracted from no-fault work-loss benefits. *Thompson v DAIIE, supra.*

Being 65 years of age is but one of several

---

[24] See *Social Security Explained*, fn 22 *supra*, § 509.4, p 166.

eligibility requirements that must be satisfied be-
fore a worker may receive the social security
retirement payments at issue in this case. Other
eligibility requirements include having paid money
into the social security system and having the
appropriate number of quarters of coverage. These
eligibility requirements could not justify the con-
clusion that the "purpose" of the payment is other
than replacement of income lost as a result of the
accident. Although there are a number of eligibil-
ity requirements for the social security survivors'
payments at issue in *O'Donnell, i.e.,* (i) the death
of a worker who had paid money into the social
security system and who had the appropriate num-
ber of quarters of coverage, and (ii) dependency on
the worker, survivors' payments were said to
"serve[  ] substantially the same purpose as the no-
fault benefits". *O'Donnell, supra,* p 545.[25] The legis-

---

[25] If the "purpose" of the government benefit is to be deemed
relevant on the authority of *O'Donnell,* the term "purpose" should be
given a meaning consistent with the meaning intended in *O'Donnell.*
It is clear from the *O'Donnell* opinion, *supra,* pp 545-546, that
governmentally mandated benefits would be deemed to serve "sub-
stantially the same purpose as the no-fault benefits" where they were
intended to provide protection against the economic hardship occa-
sioned by loss of wages:

"The survivors' benefits received pursuant to § 202 of the Social
Security Act were likewise paid as a result of the decedent's fatal
accident and served substantially the same purpose as the no-fault
benefits:

" 'As originally enacted in 1935, the Social Security Act authorized
a monthly benefit for qualified wage earners at least 65 years old and
a death benefit payable to the estate of a wage earner who died at an
earlier age. 49 Stat 622-624. *In 1939 Congress created secondary
benefits for wives, children, widows, and parents of wage earners.* See
53 Stat 1362, 1364-1366. *The benefits were intended to provide per-
sons dependent on the wage earner with protection against the
economic hardship occasioned by loss of the wage earner's support.*
*Mathews v De Castro,* 429 US 181, 185-186; 97 S Ct 431; 50 L Ed 2d
389 (1976). Generally speaking, therefore, the categories of secondary
beneficiaries were defined to include persons who were presumed to
be dependent on the wage earner at the time of his death, disability,
or retirement.' (Emphasis added.)

"Thus, the benefits received by the plaintiffs from the federal
government fell within the scope of § 3109(1)'s set-off."

lative purpose of replacing lost income from work does not change when the loss of income is attributable to a disabling injury and not death, nor does the purpose change when the worker is 65; to hold otherwise is to ignore that survivors' benefits are not payable to a spouse unless the spouse is deemed to have difficulty working, either because the spouse is 62 years old or has a child in care.[26]

### B

The social security retirement payments at issue in this case were provided to Jarosz as a result of the same accident for which no-fault benefits are payable. To conclude that the social security retirement payments *in issue* were not provided as a result of the automobile accident is to ignore that these social security payments would not be paid but for Jarosz's loss of income from wages, which in turn resulted from the automobile accident. The automobile accident that entitled Jarosz to no-fault work-loss benefits is exactly the same event but for which the social security retirement benefits in issue would not be paid.

The setoff required by § 3109(1) is not limited to cases in which the accident triggers the start-up of the governmentally mandated payments sought to be subtracted. To the extent that, but for the accident, the governmentally mandated benefit would no longer be paid, the payment replaces income lost as a result of the accident and is required to be subtracted.[27]

---

[26] 42 USC 402(b)(1)(B); 20 CFR 404.330.

[27] Attaining age 65 coupled with income eligibility qualifies one for social security retirement payments. If Jarosz's post-retirement job paid, say, $35,000 per year, he would not have been entitled to any social security retirement benefits although he was 65.

In the instant case it appears that Jarosz had arranged his post-retirement job before he retired; thus social security retirement

The Social Security Act mentions only three triggering events: death, retirement, and disability.[28] Nowhere does the act provide for payments to be triggered by an automobile accident. The Social Security Act conditions survivors' payments not upon the occurrence of an automobile accident, but rather upon loss of income because of the death of the worker; a surviving spouse who is at least 62 years of age or has a child in care will receive survivors' payments upon the death of the worker regardless of what causes the death. Similarly, the Social Security Act conditions disability payments before age 65 not upon the occurrence of an automobile accident, but rather upon loss of income because of the disability of the worker; a worker will receive disability payments regardless of what causes the disability. Finally, the Social Security Act conditions the retirement payments in issue not upon the occurrence of an automobile accident, but rather upon both a loss of income from wages and attainment of age 65; a worker who is 65 years of age will receive the social security retirement payments at issue here only if a total loss of income from wages is suffered regardless of what causes that loss of wage income.

In *O'Donnell, supra,* where the worker's death was caused by an automobile accident, this Court held that social security survivors' payments are required to be deducted from the no-fault work-loss benefits. In *Thompson, supra,* the worker's disability was caused by an automobile accident,

benefits would not have been paid at the rate applicable to an unemployed retiree if he had not lost income from post-retirement work as a result of the accident. We would not ascribe to the Legislature the intent to distinguish among persons who have reached age 65 on the basis of whether they obtain a post-retirement job before or after social security retirement eligibility is established.

[28] See McCormick, Social Security Claims and Procedures (3d ed), §§ 5, 6, p 11.

and this Court holds that the social security disability payments to the worker's dependents are required to be deducted from the no-fault workloss benefits. Similarly, if the worker's loss of income from wages at age 65 is caused by an automobile accident, the social security retirement payments payable solely because of the wage loss are required to be deducted from no-fault workloss benefits.

## C

The majority opinion states:

"For benefits to be duplicative under the standard we have announced today, substantially equivalent qualifications and provisions would have to exist. In other words, the federal or state law that provides the governmental benefits or requires them to be provided must specifically base payment of benefits upon the happening of an event, and an automobile accident must qualify as such an event."[29]

Since substantially the same benefit is payable as a retirement, survivors', or disability benefit, see fn 24, age 65 cannot properly be regarded as a distinguishing qualification—only the label of the benefit is different.

The social security survivors' payments in *O'Donnell* were specifically based on a loss of income because of the death of the worker (however caused), and the social security disability payments to the worker in *Thompson* were specifically based on a loss of income because of disability (however caused). Although an automobile accident *as such* does not "specifically" "qualify as such an event", this Court held in *O'Donnell* that

[29] *Ante,* pp 581-582.

when the event *(i.e., a loss of income from work because of death)* results from an automobile accident, the survivors' payments are required to be subtracted from a no-fault recovery; in *Thompson,* the event *(i.e., a loss of income from work because of disability)* resulted from an automobile accident, and the disability payments to the worker were subtracted from the no-fault recovery. Similarly, the social security retirement payments at issue here are "specifically based" on a total loss of income from wages at age 65 (however caused). Although an automobile accident *as such* does not "qualify as such an event", when the event *(i.e., a loss of income from work at age 65)* results from an automobile accident, the retirement payments are to that extent required to be subtracted from no-fault work-loss benefits. The "qualifications and provisions" for entitlement to the social security retirement benefits at issue here and no-fault work-loss benefits are "substantially equivalent".

The majority opinion also states:

"For purposes of the second criterion of our two-part test, the benefits received must be contingent upon the occurrence of the same automobile accident".[30]

No federal or state statute or regulation conditions entitlement to workers' compensation, or to social security survivors' or disability benefits, on the occurrence of an automobile accident. Nevertheless, it has been held that such benefits must be subtracted. See *Mathis, supra; O'Donnell, supra; Thompson, supra.*

## IV

The failure to subtract the social security retire-

---

[30] *Ante,* p 582.

ment payments at issue here renders Jarosz financially better off after the automobile accident than he would have been had he not been injured. The Court of Appeals opinion in this case undertook a mathematical analysis of Jarosz's situation, and concluded that in the year 1979, for example, Jarosz would have received the sum of $283.80 per week from work-loss benefits and social security payments if no subtraction were required although his income from post-retirement wages and social security payments would only have been $222.34 per week had he not been injured.[31] Such a result is not consistent with the legislative purpose of requiring coordination by subtracting governmentally mandated benefits.[32]

---

[31] The Court of Appeals said:

"Had there been no accident, plaintiff would have earned $200 per week before taxes. Using the statutory presumption of 15 percent tax, MCL 500.3107; MSA 24.13107, plaintiff would have received $170 per week after taxes plus $52.34 per week in social security retirement benefits in the year 1979.[1] 20 CFR 404.430 (1981). This results in an after-tax total of $222.34 per week had there not been an accident. However, because of the accident plaintiff could not work and received $113.80 per week in retirement benefits. To this amount plaintiff wishes to have added the full work-loss benefit of $170 per week (computed as 85 percent of the $200 per week plaintiff would have earned). This would result in a total amount of $283.80 per week or a total of $61.46 per week more than plaintiff would have received had there been no accident." *Jarosz v DAIIE,* fn 17 *supra,* p 91.

---

"[1] In the year 1979, social security retirement benefits were reduced $1.00 for every $2.00 earned over $4,500. In 1979, plaintiff's earnings on the Superior *[sic]* Steel Company job would have been $10,400 (52 × $200). Subtracting $4,500 leaves an overage of $5,900. Likewise, plaintiff's retirement benefits would have been reduced by one-half of $5,900 which equals $2,950 for the year or $61.46 per week. Social security would have subtracted $61.46 per week from $113.80 per week, the amount plaintiff would have received had he retired or not made over $4,500. Thus, plaintiff would have received $52.34 per week in social security retirement benefits had there not been an accident."

---

[32] Plaintiff cites two situations in which the Legislature permitted an injured worker to be financially better off after the accident than he would have been had he not been injured as grounds for rejecting a "make plaintiff whole" limitation. Insurance benefits purchased by the injured person will not be subtracted; and after this Court's

V

DAIIE alternatively argues that Jarosz's retirement payments must be considered in determining the amount of his "loss of income" resulting from the accident pursuant to § 3107 of the act.[33] We see no need to decide this question, as we base our conclusion on the mandatory setoff requirement of § 3109(1).

We would affirm the decision of the Court of Appeals and remand the cause to the circuit court for further proceedings consistent with this opinion.

KAVANAGH and BRICKLEY, JJ., concurred with LEVIN, J.

---

decision in *LeBlanc,* fn 5 *supra,* an injured person who has not elected to coordinate his medicare payments may be financially better off after the accident. In both of those cases, however, the predicate for allowing the greater recovery is that the person who received the duplicative amount voluntarily chose to pay therefor.

Plaintiff also raises the specter of all sorts of government payments having "absolutely nothing to do with an automobile accident or related injuries" being subtracted so as to limit an injured worker to a "make whole" remedy. The list of payments that would allegedly have to be subtracted to arrive at a "make whole" remedy includes interest on government bonds, payments to veterans for war-related injuries, and government employee paid vacations, retirement benefits and paid holidays. Clearly, interest on government bonds is not a "benefit" within the meaning of § 3109(1). As to the other items, see the Commissioners' Comment to the UMVARA, fn 16 *supra.*

[33] MCL 500.3107; MSA 24.13107.

The Commissioners' Comment to § 1(a)(5)(ii) of the UMVARA, 14 ULA, p 54, undercuts DAIIE's argument, as it states that payments which are not made "for work done during the time the employee was absent" are not wages. See fn 16 for text.